**SECOND DIVISION**
**MILLER, P. J.,**
**RICKMAN and REESE, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**October 31, 2019**

# In the Court of Appeals of Georgia

A19A1616. MASHBURN v. MASHBURN.
A19A1617. MASHBURN v. WIGGINS.

RICKMAN, Judge.

These related appeals arise out of two separate orders of the Whitfield County Superior Court concerning the custody of the mother's minor children, L. G. M. and F. W. In Case No. A19A1616, the mother appeals from an order granting her parents ("the grandparents") sole legal and physical custody of L. G. M. and providing the mother with four hours of supervised visitation per month. The mother asserts that the trial court erred in granting the grandparents' petition because the grandparents failed to prove by clear and convincing evidence that maternal custody of L. G. M. would cause the child physical or long-term emotional harm. She further contends that the grandparents failed to meet their burden of proof as a matter of law, because they

offered no expert testimony as to the emotional effect of maternal custody on L. G. M. Finally, the mother asserts that the trial court erred in admitting into evidence nude photographs of the mother.

In Case No. A19A1617, the mother appeals from an order granting sole legal and physical custody of F. W. to the child's father ("the father") and providing the mother with four hours of supervised visitation per month. The mother contends that the evidence failed to support the trial court's finding that a change in material conditions or circumstances affecting the welfare of F. W. had occurred. And the mother again asserts that the trial court erred in admitting into evidence nude photographs of her.

For reasons explained more fully below, we find that sufficient evidence supported the trial court's award of custody of L. G. M. to the grandparents and the award of primary physical custody of F. W. to her father. We further find, however, that the trial court's orders do not show that the court analyzed the children's best interests in awarding the mother only supervised visitation. Furthermore, the trial court's orders contained an impermissible self-executing visitation provision and failed to set forth or otherwise incorporate the parenting plan required by OCGA §

2

19-9-1. Accordingly, we vacate the trial court's orders and remand both cases for further proceedings consistent with this opinion.

When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. *Strickland v. Strickland*, 298 Ga. 630, 633 (1) (783 SE2d 606) (2016). We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility determinations. *Saravia v. Mendoza*, 303 Ga. App. 758, 758 (695 SE2d 47) (2010). We review de novo, however, the legal conclusions the trial court draws from the facts. Id.

The record shows that L. G. M. was born in April 2013 to the mother and her then-husband. L. G. M.'s father abandoned the marriage and the child when L. G. M. was approximately six months old, and the child has had no contact with her father since that time.[1] F. W. was born in March 2015 to the mother and her then-fiancé. Although the father and the mother were never married, the father legitimated F. W. and was awarded visitation with the child.

---

[1] L. G. M.'s father was named as respondent in the grandparents' petition for custody, but he filed no response and did not appear at either the temporary or the final custody hearing.

The mother had physical custody of both children from the time of each child's birth until August 2017. On approximately August 20, 2017, the mother separated from her second husband, Jordan Patterson, and the mother and children moved out of the marital residence. Several days later, on August 24, 2017, the grandparents filed their petition seeking sole legal and physical custody of L. G. M., and the father filed his petition for modification of custody as to F. W. Both petitions sought ex parte relief, with the grandparents requesting an ex parte order granting them immediate temporary custody of L. G. M. and a restraining order barring the mother from having any contact with them. The father requested an ex parte order granting him immediate temporary custody of F. W. and a restraining order barring the mother from having any contact with him. The trial court granted the requested ex parte relief, and the children were removed from the mother's custody.

On December 21, 2017, the trial court held a consolidated temporary hearing on both the grandparents' petition for custody of L. G. M. and the father's petition for custody of F. W. The evidence presented at that hearing showed that since September 1, 2017, the mother had resided in a two-bedroom rental home, with the mother's brother-in-law paying the entire first year's rent in advance. Immediately after moving out of the marital residence she shared with Patterson and before the mother

was served with the ex parte orders temporarily removing the children from her custody, the mother and her daughters spent approximately four nights with the mother of Drew Wachter.[2]

Prior to the ex parte orders being served, the mother drove a car provided by the grandparents. After the grandparents reclaimed that car, the mother's sister and brother-in-law provided a car for her, which is titled in the mother's name. At the time of the temporary hearing, the mother was working at a local Waffle House, where she worked various shifts six days a week. During her marriage to Patterson, the mother had worked as a sales consultant for Pure Romance, a company that marketed sexually-themed, adult novelties through in-home parties. Additionally, the mother acknowledged that she and Destiny Wachter (the wife of Drew) had contemplated a business venture where they would charge women for personal nude photo shoots. The mother's attorney objected to this line of questioning, but the trial court overruled the objection on the grounds that the information was relevant to the environment in which the children were being raised. The trial court subsequently allowed the grandparents to introduce into evidence 32 pictures of the mother in various states of undress, with the mother indicating that the photographs were meant

---

[2] Wachter's relevance to this case is explained more fully below.

to be used as part of the proposed business venture.[3] According to the mother, the photographs were taken on approximately four different occasions. Some of the pictures were taken inside the marital residence she shared with Patterson and her daughters, while others were taken in or outside of a vacation home rented by the grandparents for a family vacation. The mother further testified, however, that her children were not present when the pictures were taken and had never seen the photographs.

The grandparents also introduced into evidence a child's lunchbox, containing drug paraphernalia designed to facilitate the smoking of marijuana.[4] A marijuana grinder found inside the lunchbox was in the shape of a small ball that resembled a child's toy. On cross-examination, the mother acknowledged ownership of the lunchbox, and also that she had smoked marijuana during her marriage to Patterson. However, she denied smoking marijuana in front of her children or otherwise exposing them to drugs or drug paraphernalia. The mother further testified that she

---

[3] After the testimony regarding the business venture was allowed into evidence, the mother's attorney did not object to the introduction of the photographs.

[4] Evidence at the permanent custody hearing showed that the lunchbox had been located in the storage closet in the carport at the marital residence the mother shared with Patterson, and that the mother left the lunchbox behind when she separated from Patterson.

was willing to submit to a drug screen that day. Additionally, the mother stated that since losing custody of her children, she had seen a psychiatrist and been diagnosed with bipolar disorder, depression, anxiety, and PTSD. The mother now met with a therapist on a weekly basis and took medication to treat the bipolar disorder.

Additional evidence introduced by the grandparents included copies of text messages between the mother and Patterson which showed that on several occasions the mother was away from home after midnight procuring marijuana for either herself or others. The mother explained that on those occasions, her daughters would have been home with Patterson and asleep. Additionally, the mother acknowledged that her children had slept in her bed when Patterson was also present, and sometimes slept with Patterson when the mother was out.

When questioned about her marital problems with Patterson, the mother admitted to having engaged in an extramarital affair. According to the mother, when she and Patterson fought, he would "scream and holler and throw chairs and kick the baby gate over." Although the mother testified that she found some things on Patterson's phone that "concerned" her, she did not provide any information regarding the nature of those items.

The grandparents also introduced evidence concerning the mother's relationship with Drew Wachter. The evidence showed that Wachter was a convicted sex offender and was required to register as such.[5] The mother admitted that she was aware of Wachter's criminal status and that she had a prior romantic relationship with him. She further testified, however, that she was no longer romantically involved with Wachter, although they did work together at the Waffle House. The mother admitted that she had been at Wachter's residence the day before the temporary hearing but claimed she was there to visit Wachter's roommate. Additionally, the mother denied ever allowing Wachter around her children, and she explained that although her children were with her during the three to four days she spent at the home of Wachter's mother, Wachter was not present in the home. The mother also stated that she would have no objection to the court including in any custody order a provision prohibiting Wachter from having contact with her children.

Prior to the temporary hearing, the mother was allowed two hours of supervised visitation with her children every other weekend. The mother explained that she was required to pay $70 for each visit to cover the cost of the supervisor. The mother

---

[5] A copy of Wachter's registration as a sex offender showed he had been convicted of aggravated sexual battery.

presented the testimony of Christine Carroll, who supervised each of the mother's visits prior to the temporary hearing. Carroll described the mother's parenting style as "wonderful," explaining that the mother "corrects the girls when they do not use manners. She corrects them . . . if they're using ugly words with each other . . . [s]he teaches them to share, cooperate. [She's] . . . a joy to do the visit with. I wish more were like her." Additionally, Carroll noted that the mother always came to the visits well-prepared with nutritious snacks (including fruits and vegetables) and activities that she could engage in with her children (such as crafts, games, and reading). Carroll described the children as being closely bonded with their mother and stated that L. G. M., especially, was having a hard time being separated from her mother.

Following the temporary hearing, the trial court entered temporary custody orders in both cases. In Case No. A19A1616, the court granted temporary custody of L. G. M. to the grandparents and provided the mother with two hours of supervised visitation every other weekend. The court entered a similar order in Case No. A19A1617, awarding temporary custody of F. W. to her father and giving the mother two hours of supervised visitation every other weekend.

In both cases, the trial court based its decision to take custody from the mother and allow her only supervised visitation on the following factual findings: (1) the

9

mother frequently left the children alone with Patterson, whom the mother claimed "pushed over chairs, screamed at [the mother], and engaged in questionable Internet searches"; (2) the mother left the children with Patterson so that she could procure marijuana for herself and others, distribute marijuana, and engage in an extramarital affair; (3) the mother allowed the children to sleep in the same bed with Patterson despite the lack of a biological relationship with their stepfather; (4) the mother smoked marijuana; (5) the mother stored her marijuana and related drug paraphernalia in a "Finding Nemo" lunchbox, which would be attractive to small children; (6) the mother was currently involved in a sexual relationship with Wachter, despite the fact that he was a registered sex offender, and had been seen with Wachter two days before the temporary hearing, and the court was convinced the relationship would continue. With respect to L. G. M., the court found that this evidence served to overcome the statutory presumption in favor of parental custody, showed clearly and convincingly that custody with the mother "would physically harm the child," and demonstrated that it was in the child's best interests that custody be given to the grandparents. With respect to F. W., the court found that these facts showed that there had been a material change of circumstances related to the child and that it was in the child's best interest that custody be granted to the father.

10

Following entry of the temporary order, the mother filed a motion in both cases seeking the appointment of a guardian ad litem for each child. It appears from the record that the trial court never acted on either motion and no guardian ad litem was appointed.

In August 2018, the trial court held a joint final hearing in both cases. At the outset of the hearing, the trial court stated that in making its final decision, it would also consider the evidence presented at the temporary hearing eight months earlier.

The mother testified that in February 2018, she went to work at the local Volkswagen plant as a quality inspector. Typically, the mother worked Monday through Thursday from 5:45 a. m. until 4:45 p. m. Thus, she worked a minimum of 40 hours a week and occasionally worked mandatory overtime hours. The job provided the mother with an income sufficient to allow her to feed and clothe her children and provide for their daily needs. Additionally, if the mother were awarded custody of the children, she could provide them with health insurance through her employer. If custody were returned to the mother, she would drop the older child (L. G. M.) at her sister's house on her way to work. The sister would then get the child ready for school and the child would attend aftercare at school until the mother picked

her up. The younger child (F. W.) would attend the on-site day care at the mother's place of employment.

The mother continued to live in her two-bedroom rental home and she planned to renew the lease. She also had a car and a valid driver's license. The mother acknowledged that her brother-in-law paid her rent, utilities and car insurance, and the brother-in-law testified that he intended to continue that financial support for at least the next two years.

At the time of the final hearing, the mother was pregnant with her third child, which was due in the next several weeks. The father of this child was Drew Wachter. The mother stated that she and Wachter never had an ongoing romantic relationship, but that they did have sex on several occasions, and she became pregnant when her birth control failed. The mother denied having any current romantic or sexual relationship with Wachter, noting that Wachter remained married to Destiny and the couple currently had a three-month-old child. The mother further explained that she and Wachter were in contact because they were going to have a child together, and she had last seen him two weeks before the hearing when she ran into him at a local Walmart. When questioned, the mother stated her understanding that Wachter could not have any contact with L. G. M. or F. W., as such contact would violate his

12

probation. She had no plans to expose her two older children to Wachter, and she had no objection to the court prohibiting contact between Wachter and L. G. M. and F. W.

The mother testified that although her pregnancy prevented her from taking the medication prescribed for her bipolar disorder, she planned to resume that medicine after the baby was born. Additionally, she continued to see a therapist every other week, and she planned to continue with therapy. According to the mother, she had not used marijuana for a year, she would not test positive for drugs, she did not drink, she had never been charged with any drug or alcohol related offense, and she had never been convicted of any crime. The mother further explained that she had never exposed her children to drugs and that the lunchbox in which she had stored her drug paraphernalia was not in an area of the home accessible to her children.[6]

The evidence showed that the mother had not exercised her right to supervised visitation since March 23, a period of five months.[7] The mother had, however,

---

[6] Specifically, the mother stated that the lunchbox was located in a storage room adjacent to the home's carport. The grandmother's testimony also acknowledged that the grandparents had recovered the lunchbox from the marital home the mother shared with Patterson, after the mother had moved out.

[7] According to the mother, after she missed two visits because of mandatory overtime at her job, the visitation supervisor told the mother to have her attorney

13

maintained telephone contact with her children, speaking with each daughter twice a week. The visitation supervisor testified that the mother's next visit after March 23 was scheduled for April 4, but on that date, both of the children were out of town. The mother canceled two additional visits scheduled in April because of mandatory overtime at her job. When the mother attempted to schedule a visit in May, the supervisor told the mother to contact her attorney to schedule any additional visits. The supervisor stated that after a parent missed two scheduled visits, it was the policy of her employer to cancel all future visits.

Drew Wachter testified that he was 17 years old at the time of his conviction for aggravated sexual battery,[8] and he was sentenced under the First Offender Act[9] to five years on probation with the first six months served in the probation detention center. As a condition of his probation, Wachter could have no contact with minor children other than those of his family members. He was convicted of violating his

---

contact the supervisor's employer to arrange any further visits. Although the mother asked her attorney to arrange additional visits, the attorney did not contact the visitation supervisor and the mother eventually replaced her as counsel in June, approximately six weeks before the final hearing.

[8] Wachter claimed that the conviction resulted from a consensual incident with a 15-year-old girl involving the two "touch[ing] each other."

[9] OCGA § 42-8-60.

probation on two occasions. Wachter served seven months in custody as a result of the first violation and eight months in custody as a result of the second violation.[10]

Wachter acknowledged that the mother was pregnant with his child, that he was married to someone other than the mother, and that his wife had recently given birth to another of his children. He stated that he had only a brief romantic relationship with the mother and the relationship had ended several months earlier. Wachter and the mother planned for the mother to have primary custody of their child, and Wachter stated that he would not have contact with either L. G. M. or F. W.

The grandmother testified that L. G. M. had lived with the grandparents since August 2017 and was currently enrolled in school, where she was doing well. The grandparents lived with L. G. M. in a five bedroom home, and L. G. M. slept with them on a regular basis. The home also had an apartment with a separate entrance that the grandparents rented out through the Airbnb website. The grandmother worked as a hairdresser three days a week, and on those days a sitter would get L. G. M. from school and bring her to the hair salon. The grandparents had F. W. over every other

---

[10] Wachter stated that his probation was scheduled to end July 19, 2019.

weekend so L. G. M. could spend time with her sister. Additionally, F. W.'s father had allowed the grandparents to take F. W. with them on family vacations.

The grandmother acknowledged that she had never seen the mother's current home, had no knowledge of the mother's current job, and could not testify as to any progress the mother had made since the issuance of the ex parte order one year earlier. Instead, all of the allegations set forth in the grandparents' petition for custody were based on facts that existed at least 12 months prior to the final hearing. Additionally, the grandmother testified that she had never witnessed the mother physically harm the children and that she had no knowledge of Patterson ever abusing the mother or her children. The grandparents came forward with no evidence showing recent drug use by the mother.[11]

With respect to F. W., the child's father testified that he had married approximately one month before the final hearing and that F. W. now resided with him and his wife in a two-bedroom apartment. The father's wife cared for F. W. two days a week, and the other three days the child attended daycare. On cross-examination, the father acknowledged that he had never seen the mother inflict any

---

[11] Although the temporary order gave the grandparents the right to request that the mother undergo drug testing, they had never exercised that right.

16

sort of emotional or physical abuse on either of her children, nor had he seen the mother engage in excessive drug use. Additionally, the father stated that all of the allegations in his petition were based on facts that were more than a year old, and that he had no knowledge of the mother's current circumstances.

In addition to her own testimony and that of Wachter, the mother presented the testimony of a coworker. The coworker testified that she was familiar with Volkswagen's hiring process, which included taking a drug test. Anyone who tested positive for drugs would not be hired. The coworker further stated that she had not witnessed the mother drink or use drugs of any kind. Nor did she have any concerns regarding the safety and well-being of any child in the mother's custody, and the coworker had allowed the mother to babysit her own child.

Another witness testified that she been a close friend of the mother for 12 years. During that time, the friend had never known the mother to abuse drugs or alcohol. Additionally, the friend had visited the marital residence the mother shared with Patterson and had never seen anything inappropriate in the home. And like the coworker, the friend had no concerns about the safety of any child left in the mother's custody. The friend explained that she had a five-year-old son whom the mother babysat on multiple occasions.

The mother moved for a directed verdict on the grandparents' petition for custody of L. G. M., arguing that the grandparents had failed to meet their burden of proof. The trial court denied that motion, and approximately two weeks after the final hearing, the Court entered final orders in both cases. The order entered in Case No. A19A1616 granted the grandparents' petition and awarded them primary physical custody and sole legal custody of L. G. M. The court concluded that the grandparents had "shown by clear and convincing evidence that it would be harmful to the child, both physically and emotionally for [her] to be in the [m]other's custody." Accordingly, the court found that the grandparents had overcome the statutory presumption in favor of parental custody. In reaching these conclusions, the court relied on the same six factual findings on which it relied in granting the grandparents temporary custody of L. G. M. The court also relied on five additional factual findings: (1) that the mother had not attempted to exercise visitation with her children since March 2018, meaning she had foregone the opportunity to "repair her relationship with them"; (2) the mother refused to take responsibility for her failure to visit with the children and that fact did "not bode well for the mother's willingness to properly care for and protect her child"; (3) the mother's pregnancy by Wachter showed that the mother had not ended her relationship with Wachter, that she had lied

18

to the court, that the court gave "little[,] if any[,] weight" to her testimony concerning Wachter, and that the court therefore had "no reason to believe she will stop now [or] prevent her children from having contact with [Wachter]"; (4) Wachter had twice violated his probation by being in contact with underage children; and (5) Wachter was a sexual predator from whom the mother's children needed protection.

In Case No. A19A1617, the trial court granted the father's petition and gave him permanent primary physical and sole legal custody of F. W. Specifically, the court found that there had been a material change in circumstances regarding the child, and that it was in F. W.'s best interests that custody be with the father. In reaching these conclusions, the trial court again relied on the exact same factual findings on which it relied in granting the grandparent's petition as to L. G. M.

In both cases, the trial court found that it was in the best interest of the children that visitation with the mother be supervised, as the mother had "engaged in a pattern of leaving her children alone with, or exposing her children to, people who could pose a danger to their safety." Both orders awarded the mother two hours of supervised visitation with each child every other weekend. Additionally, the mother was allowed a minimum of two phone calls per week with each child "during reasonable hours." Both orders also prohibited the mother from ingesting any

19

controlled substance (including marijuana) not prescribed for her by her physician. The order as to L. G. M. gave the grandparents the right to require the mother to submit to a drug screen, while the order regarding F. W. gave the father the right to require such a drug screen. In both cases, the mother was directed to sign all "waivers" required for the drug screens. Both orders further provided that the mother would lose two visits with her child for each positive drug screen.[12]

Following the entry of the final orders in each case, the mother filed these appeals.

*Case No. A19A1616*

In this appeal, the mother challenges the trial court's order awarding custody of L. G. M. to the grandparents. Specifically, the mother contends that the evidence does not support the trial court's judgment; that the grandparents' failure to introduce expert testimony meant they could not meet their burden of proof as a matter of law; and that the trial court erred in admitting into evidence nude photographs of the mother.

---

[12] The orders do not clarify if the mother would lose visitation with F. W. for any positive drug screen requested by the grandparents (as opposed to F. W.'s father), or whether she would lose visitation with L. G. M. for any positive drug screen requested by F. W.'s father (as opposed to the grandparents).

1. In determining whether the trial court erred in taking custody of L. G. M. from the mother, we bear in mind that under both the United States and Georgia Constitutions, parents have a fundamental right to the care and custody of their children. *Patten v. Ardis*, 304 Ga. 140, 143-144 (2) (816 SE2d 633) (2018). "This right to the custody and control of one's child is a fiercely guarded right that should be infringed upon only under the most compelling circumstances." (Citation and punctuation omitted.) *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion) See also *Troxel v. Granville*, 530 U. S. 57, 65 (2) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion) (the constitutional right of parents to "the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court") (punctuation omitted); *In the Interest of M. F.*, 298 Ga. 138, 145 (2) (780 SE2d 291) (2015) ("there can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent" to guide "the care, custody, and management of their children") (citations and punctuation omitted).

Custody disputes between a natural parent and grandparent are governed by OCGA § 19-7-1. That statute provides, in relevant part:

in any action involving the custody of a child between the parents or either parent and a . . . grandparent . . . parental power may be lost by the parent . . . if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third-party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children, but this presumption may be overcome by showing that an award of custody to such third-party is in the best interest of the child or children.

OCGA § 19-7-1 (b.1). Under the statute, therefore, it is the third party seeking custody of the child who bears the burden of coming forward with evidence showing that it is in the child's best interests that the child be removed from parental custody. And until the petitioner comes forward with such evidence, a parent is under no burden to show that she is a fit parent or that her child will be safe in her custody. See *Troxel*, 530 U. S. at 68 (II) (noting the constitutional presumption that "fit parents act in the best interests of their children"); *Clark*, 273 Ga. at 593 (II) (whenever a third party challenges a natural parent's right to custody of his or her child, that party must overcome three constitutionally-based presumptions in favor of parental custody: "(1)

22

the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent.")

Recognizing the significant constitutional interests at stake where a non-parent seeks to take custody from a child's parent, our Supreme Court has held that "the state may interfere with a parent's right to raise his or her child only when the state acts to protect the child's health or welfare and the parent's decision would result in harm to the child." *Clark*, 273 Ga. at 597 (IV). See also *Patten*, 304 Ga. at 144 (3). Thus, as used in OCGA § 19-7-1 (b.1), the best interest of the child standard means that "the third party must prove by clear and convincing evidence that the child will suffer physical or emotional harm if custody were awarded to the biological parent. Once this showing is made, the third party must then show that an award of custody to him or her will best promote the child's welfare and happiness." *Clark*, 273 Ga. at 599 (V). See also *Strickland*, 298 Ga. at 631 (1).

In this context, emotional harm is defined as "significant, long-term emotional harm," *Strickland*, 298 Ga. at 631 (1), and does "not mean merely social or economic disadvantages." *Clark*, 273 Ga. at 598 (IV). Nor does emotional harm refer to the stress and discomfort that naturally accompanies a change in home and/or school. See id. (noting that such changes "will often be difficult for a child, but some level of

stress and discomfort may be warranted when the goal is reunification of the child with the parent"). Thus, in determining if a child will suffer harm in the custody of her parent, a court should focus on

> the parent's ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent, and the court is not permitted to terminate a parent's natural right to custody merely because it believes that the child[] might have better financial, educational, or moral advantages elsewhere[.] [In other words,] the parent's ability to raise her children is not to be compared to the fitness of a third person.

(Citation and punctuation omitted.) *Jewell*, 346 Ga. App. at 736 (1).

(a) As discussed below, we find that the trial court's award of custody to the grandparents was supported by evidence showing that, given the mother's continued relationship with a convicted sex offender, L. G. M. would likely suffer physical harm if returned to their mother's custody. Because we are remanding the case for further proceedings on the issue of visitation and a parenting plan, however, we also note that the trial court erred to the extent it relied on factual findings based on evidence concerning the mother's conduct that was more than a year old, especially in light of the grandparents' failure to show that such conduct had resulted in either physical or emotional harm to either child.

24

(i) We begin with the evidence supporting the trial court's award of custody to the grandparents. As noted above, the trial court found that because Wachter was a convicted sex offender who had violated the terms of his probation, he was a sexual predator from whom both children needed protection. And given that the mother was now pregnant with Wachter's child, the court found the mother would allow Wachter to have contact with her other children and that the mother's testimony to the contrary was not credible. The question, therefore, is whether these findings constitute clear and convincing evidence to support the trial court's conclusion that the children would likely suffer physical harm if they were returned to their mother's custody. We find that they do.

In reaching this conclusion, we note that although clear and convincing evidence represents a heightened standard of proof, it did not require the grandparents to come forward with unequivocal or undisputed evidence that custody with the mother would result in physical harm to L. G. M. See *Luke v. Luke*, 280 Ga. App. 607, 611 (3) (634 SE2d 439) (2006) (applying OCGA § 19-7-3, the Grandparent Visitation Statute). See also *Santosky v. Kramer*, 455 U. S. 745, 756 (II) (102 SCt 1388, 71 LE2d 599) (1982) (discussing the clear and convincing evidence standard). Thus, a trial court may find clear and convincing evidence that custody with the

25

mother would result in physical harm to the children, "notwithstanding evidence or circumstances that weigh [in favor of the mother.]" *Luke*, 280 Ga. App. at 611 (3).

The evidence on which the trial court relied showed that following his conviction for sexual battery, Wachter was placed on probation with a requirement that he have no contact with minors to whom he was not related. Wachter, however, twice-violated that condition. And although we do not know the exact circumstances of those violations, the trial court with jurisdiction over Wachter's criminal case found them to be serious enough that it ordered Wachter's incarceration for a relatively significant period of time on both occasions. Additionally, the mother began a relationship with Wachter with knowledge of the fact that he was a convicted sex offender; she lied to the court about her continuing relationship with Wachter; and at the time of the final hearing, she was pregnant with Wachter's child, meaning that Wachter would, to some degree, be a permanent part of the mother's life. These facts constitute some clear and convincing evidence that L. G. M. would face the threat of physical harm if returned to the custody of her mother. See *In the Interest of C. A. J.*, 331 Ga. App. 788, 791-792 (1) (771 SE2d 457) (2015) (in a child's dependency proceeding, evidence supporting the decision to take custody from the mother included the fact that the mother's boyfriend was a convicted sex offender);

26

*In the Interest of K. L. M.*, 316 Ga. App. 246, 251-252 (c) (729 SE2d 452) (2012) (evidence supporting termination of mother's parental rights included the fact that the mother had continued to maintain contact with the children's father, a registered sex offender; "[a]lthough the mother stated that she had ended her relationship with the father, she could not explain why [, in light of the other evidence,] the juvenile court should believe her"); *In the Interest of C. R. G.*, 272 Ga. App. 161, 162 (611 SE2d 784) (2005) (facts, including that mother had moved into her boyfriend's home where the boyfriend's brother, a registered sex offender, also resided supported awarding custody of the child to DFACS).

(ii) We next address the evidence on which the trial court improperly relied, noting that on remand, the trial court should not rely on this evidence in evaluating the best interests of L. G. M. with respect to visitation. Instead, the court should focus on any additional evidence presented by the parties concerning the mother's most recent conduct.

In cases involving parental custody of a child, the question is not whether the child was in danger of harm at the time of the initial or temporary custody order. Instead, the question is whether the child would suffer harm if custody were returned to the parent as of the date of the final order. Cf. *In the Interest of J. C.*, 334 Ga. App.

27

526, 538 (2) (d) (779 SE2d 734) (2015) (in child dependency proceedings, "[e]vidence of a parent's past conduct and the possibility [that such conduct might occur again, in the future] does not support a transfer of custody" away from the parent) (physical precedent only); *In the Interest of D. L. T. C.*, 299 Ga. App. 765, 770 (1) (684 SE2d 29) (2009) (past conduct, standing alone, is insufficient to show that a child is currently dependent and should be removed from the parent's custody). Thus, the trial court's three factual findings as to Patterson were irrelevant to the question of harm, as the mother had not lived with Patterson in more than a year. Similarly, in the absence of any evidence that the mother was currently using drugs or storing them in her home, the fact that the mother had previously smoked marijuana and had previously stored marijuana in a child's lunchbox did not support the conclusion that the mother's current conduct posed a threat to her children. Moreover, the grandparents came forward with no such evidence. Indeed, the only evidence concerning the mother's drug use in the year prior to the final hearing served to establish that the mother had not used drugs during that time frame.[13]

---

[13] This evidence included the mother's testimony that she was no longer using marijuana but had instead sought professional help to medicate her anxiety, depression, and bipolar disorder, and the fact that the mother was employed at a facility that tested for drugs. Additionally, both the grandmother and F. W.'s father testified that they were unaware of any drug use by the mother in the previous year.

More importantly, there was no evidence that the children had suffered either physical or emotional harm as a result of their contact with Patterson or their mother's past drug use. Specifically, the grandparents failed to show that the mother had exposed her children to any danger by leaving them with Patterson or allowing them to sleep in the same bed as their stepfather.[14] Nor did the grandparents show that the children had experienced physical or emotional harm as a result of the mother's past drug use. There was no evidence that the children were exposed to or were otherwise aware of their mother's marijuana use, that the children had ever gained possession of the mother's drugs, or that the mother abused the children while under the influence of drugs. Both F. W.'s father and the mother's long-time friend testified that to their knowledge, the mother never engaged in excessive drug use. The father further testified and that he had never seen the mother inflict any sort of emotional or physical harm on the children, and the grandmother testified that to her knowledge, the mother had never physically harmed either child.

---

[14] The trial court seemed to place great weight on its finding that the mother allowed the children to sleep in the same bed as Patterson, despite the lack of a biological relationship. The record shows, however, that the grandparents are not biologically related to the children, as they are the mother's adoptive parents. And the grandmother testified that L. G. M. regularly slept with both her and the grandfather – an adult male who, like Patterson, was legally, but not biologically, related to L. G. M.

Although the mother's failure to exercise in-person visitation with the children had occurred in the months preceding the final hearing, the grandparents offered no evidence to show that this failure caused the children any type of emotional harm. Nor did the missed visits serve to demonstrate that the children would suffer harm if custody were returned to the mother. While the trial court found that the missed visits and the mother's failure to take responsibility for the same "did not bode well for the mother's willingness to properly care for and protect her child[ren]," OCGA § 19-7-1 (b.1), does not allow a trial court to engage in that kind of speculation with respect to future harm. See *Floyd v. Gibson*, 337 Ga. App. 474, 479 (1) (788 SE2d 84) (2016).

(b) Although we find that some clear and convincing evidence supported the trial court's award of physical custody of L. G. M. to the grandparents, we nevertheless find it necessary to vacate and remand the court's order, for several reasons.

(i) Our Supreme Court has explained previously that a parent's visitation rights – and any material changes to those rights – "necessarily implicate the best interest of the child because visitation controls the child's contact with [a] non-custodial parent." *Dellinger v. Dellinger*, 278 Ga. 732, 733 (1) (609 SE2d 331) (2004). As a

matter of logic, therefore, in making a decision on visitation, a court must consider the best interests of the child as those interests relate to visitation (as opposed to physical and legal custody). And where custody is awarded to a third party, *Clark* requires a court to determine what type of visitation will "best promote the child's welfare and happiness." *Clark*, 273 Ga. at 599 (V). In making that determination, a court must consider a variety of factors, including: "(1) who are the past and present caretakers of the child; (2) with whom has the child formed psychological bonds and how strong are those bonds; (3) have the competing parties evidenced interest in, and contact with, the child over time; and (4) does the child have unique medical or psychological needs" that would be impacted by visitation. Id. at 598-599 (IV). See also OCGA § 19-9-3 (a) (3) (listing factors relevant to determining the best interest of the child in custody and visitation cases involving two parents). Here, however, the court conducted no such best interest analysis, but instead found that the mother would be allowed only supervised visitation because she had "engaged in a pattern of leaving her children alone with, or exposing her children to, people who could pose a danger to their safety."[15] Accordingly, we vacate that part of the trial court's

---

[15] It is unclear from the record as to what "dangerous people" the mother had either left her children with or exposed her children to. Given that we are remanding for reconsideration of the question of visitation, we assume the trial court will

order granting the mother only limited, supervised visitation and remand for consideration of what visitation would best serve to promote L. G. M.'s welfare and happiness in light of the factors set forth in *Clark*.

(ii) The trial court's order contains two additional legal errors that the court should address on remand. First, the order provides that the mother shall lose two visits with L. G. M. for every positive drug screen. This provision violates the rule against self-executing changes in visitation because

> [a]s drafted[,] the provision would authorize implementation of the self-executing change of visitation at any time, even though the change can be triggered months or even years in the future. This material change in the child[]'s visitation would be accomplished automatically and without any regard to the circumstances existing in the child[]'s [life] at the time of the change.

*Dellinger*, 278 Ga. at 735 (1). See also *Hardin v. Hardin*, 338 Ga. App. 541, 544 (1) (790 SE2d 546) (2016) ("self-executing provisions [involving visitation] that execute at some uncertain date well into the future are not permitted because the trial court creating those provisions cannot know at the time of their creation what disposition at that future date would serve the best interests of the child").

------

specify, in its new order, the evidence on which it relied to make this finding.

Additionally, the order contains no parenting plan, in violation of OCGA § 19-9-1 (a).[16] Such a plan is required even where one party is awarded sole legal and physical custody of the child, as "[t]he parenting plan must include several details beyond custody and visitation, including, among many things, the rights of both parents to access the child's records and information related to education, health, health insurance, extracurricular activities, and religious communications." *Williams v. Williams*, 301 Ga. 218, 224 (3) (800 SE2d 282) (2017) (footnote omitted). See also *Moore v. Moore*, 346 Ga. App. 58, 59-60 (2) (815 SE2d 242) (2018); OCGA § 19-9-1 (b) (1). On remand, therefore, the trial court should work with the parties to formulate an acceptable parenting plan and either incorporate the same into its custody order or enter the plan separately. In this regard, we note that because approximately two years have passed since the temporary hearing and over a year has elapsed since the final hearing, there may be additional, more recent evidence available for the trial court to consider both with respect to visitation and the required parenting plan. See *Steedley*

---

[16] OCGA § 19-9-1 (a) provides, in relevant part, that "[t]he final order in any legal action involving the custody of a child, including modification actions, *shall* incorporate a permanent parenting plan as further set forth in this Code section[.]" (Emphasis supplied).

33

*v. Gilbreth*, \_\_\_ Ga. App. \_\_\_ (1) (Case No. A19A1413, decided Oct. 9, 2019). See also *In the Interest of K. M.*, 344 Ga. App. 838, 847 (2) (811 SE2d 505) (2018).

2. The mother contends that the trial court erred in denying her motion for a directed verdict because the grandparents failed to offer any expert testimony to support the conclusion that L. G. M. would suffer long-term emotional harm if returned to her mother's custody. Pretermitting whether the grandparents were required to present expert testimony to establish the likelihood of emotional harm, the record shows that the grandparents presented *no* evidence to support the trial court's finding that custody with the mother would result in long-term emotional harm to L. G. M. Compare *Strickland*, 298 Ga. at 632-633 (1) (grandparents presented clear and convincing evidence that children would suffer significant long-term emotional harm in their mother's custody; evidence as to emotional harm included the testimony of the children's therapists and their court-appointed guardian ad litem); *Brawner v. Miller*, 334 Ga. App. 214, 218 (2) (778 SE2d 839) (2015) (conclusion that children would suffer long-term emotional harm if custody were taken from the grandmother and given to the father was supported by the grandmother's testimony concerning the impact of their mother's death on the children and the father's lack of a relationship with the children). Nevertheless, the grandparents' failure to come forward with such

34

evidence provides no basis for reversal. As noted above, there was some clear and convincing evidence to support the trial court's finding that L. G. M. would likely suffer physical harm in her mother's custody. Giving this finding, the trial court did not err in denying the mother's motion for directed verdict. See generally *Clark*, 273 Ga. at 599 (V).

3. The mother also asserts that the trial court erred in admitting into evidence the nude photographs introduced by the grandparents at the temporary hearing.[17] We agree with the mother that these pictures were irrelevant, as there was no evidence that her children were aware of or exposed to the photographs or the production of the same. See *Jewell*, 346 Ga. App. at 738 (1) ("sexually provocative" photographs of mother were irrelevant to the issue of custody, as there was no evidence that the child "had seen any of the photographs or experienced any distress or harm related to the photographs"). In making its factual findings, however, the trial court did not reference or otherwise rely on the photographs or the mother's conduct in making the same. Accordingly, the mother cannot show that she suffered prejudice as a result of their admission. See OCGA § 24-1-103 (a) ("[e]rror shall not be predicated upon a

---

[17] In addressing this claim of error, we assume, without deciding, that the mother preserved the same below.

ruling which admits or excludes evidence unless a substantial right of the party is affected").

*Case No. A19A1617*

In Case No. A19A1617, the mother asserts that the evidence did not support the trial court's order granting the father's petition for a change in custody as to F. W. and granting the mother only supervised visitation. She further contends that the trial court erred in admitting into evidence nude photographs of the mother.

4. To grant a petition for a change in the custody of a child, a trial court must engage in a two-step process. First, the court must determine whether "there has been a material change of condition affecting the welfare of the child since the last custody award." (Citation and punctuation omitted.) *Viskup v. Viskup*, 291 Ga. 103, 105 (2) (727 SE2d 97) (2012) See also OCGA § 19-9-3 (b) (a trial court may modify custody "based upon a showing of a change in any material conditions or circumstances of a party or the child"). If the court finds such a material change in circumstances, it must then determine whether, given the changed circumstances, the best interests of the child warrant a change in custody. *Viskup*, 291 Ga. at 105 (2). The party seeking the custodial change bears the burden of proving both a material change in circumstances and that a change in custody would serve the best interests of the child. *Burnham v.*

*Burnham*, 350 Ga. App. 348, 350-351 (1) (829 SE2d 425) (2019). On appeal, the mother contends that the father failed to meet this burden of proof with respect to showing a material change in circumstances.[18]

(a) We will affirm a trial court's finding as to a material change in circumstances where there is any evidence to support it. See *Bankston v. Warbington*, 332 Ga. App. 29, 32 (1) (771 SE2d 726) (2015). And here, the evidence showed one or more material changes in circumstances that could affect F. W. Specifically, the record shows that at the time of the original custody proceeding, the mother did not work outside the home. At the time of the final hearing in this case, however, the mother was employed full-time, and if F. W. resided with the mother, the child would leave her home before 5:00 a. m. four days a week to spend approximately 11 hours in day care. The evidence further showed that the father had experienced a change in his circumstances. He had married, was employed full-time with the state, and no longer resided with his parents. The father and his wife had an apartment in which F. W. had her own room, and the father's wife was able to stay at home with F. W. two days a week. Given that "circumstances warranting a change in custody are not

---

[18] The mother does not challenge the trial court's finding that, in light of the material change in circumstances, a change in custody was in the best interests of F. W.

confined to those of the custodial parent," and that "any new and material change in circumstances that affects the child must . . . be considered," this evidence constitutes some evidence supporting the trial court's conclusion that a material change in circumstances had occurred. (Citation and punctuation omitted.) *Viskup*, 291 Ga. at 105 (2) ("[t]he evidence sufficient to warrant a modification of custody can consist of a change in material conditions which have a positive effect on the child's welfare as well as changes which adversely affect the child"); *Weickert v. Weickert*, 268 Ga. App. 624, 627 (1) (602 SE2d 337) (2004) (a trial court is not required to find a material change for the worse to modify custody).

(b) Although we find the evidence supports the award of primary physical custody of F. W. to the father, we find it necessary to vacate and remand the custody order.

(i) As in the case involving L. G. M., the trial court's order in this case reflects that in granting the mother only limited, supervised visitation, the trial court failed to consider what type of visitation would best serve F. W.'s happiness and welfare. Accordingly, we vacate the trial court's order and remand for the court to reconsider the issue of visitation. In determining the question of appropriate visitation, the trial

court should consider the factors relevant to the best interest of the child as set forth in OCGA § 19-9-3 (a) (3).

(ii) Additionally, we find that the trial court's order in this case suffers from the same legal errors as the order with respect to L. G. M. Specifically, the order as to F. W. also contains an impermissible self-executing provision as to visitation, and it contains no parenting plan, in violation of OCGA § 19-9-1 (a). On remand, the court should also address these legal errors, taking into consideration any more recent evidence that may be available as to both visitation and the parenting plan.

5. For the reasons explained above in Division (3), we agree with the mother that the trial court erred in admitting the nude photographs of her proffered by the grandparents at the temporary hearing. As also explained in Division (3), however, the mother cannot show she suffered prejudice as a result of this evidence.

For the reasons set forth above, we vacate the orders of the trial court in both Case No. A19A1616 and Case No. A19A1617 and remand for the trial court to consider any more recent, available evidence relevant to the questions of visitation and the parenting plan. After the consideration of such evidence, the trial should enter a new order in each case that addresses the mother's visitation with each child considering the best interest of the child under the factors set forth in *Clark* and/or

OCGA § 19-9-3 (a); omits any self-executing provisions as to custody or visitation; and incorporates the parenting plan required by OCGA § 19-9-1.

*Judgment vacated and case remanded with direction in Case No. A19A1616. Judgment vacated and case remanded with direction in Case No. A19A1617. Miller, P. J., and Reese, J., concur.*