**FIFTH DIVISION
MCFADDEN, P. J.,
BRANCH and BETHEL, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**March 1, 2018**

# In the Court of Appeals of Georgia

A17A1747. IN THE INTEREST OF K. M., a child.

BRANCH, Judge.

The mother of K. M., a minor child, appeals from an order of the Camden County Juvenile Court denying the mother's petition to terminate the temporary guardianship of K. M. held by K. M.'s maternal grandparents. The mother contends that the trial court applied the wrong evidentiary standard to determine whether the guardianship should be terminated and that under the correct evidentiary standard, the evidence does not support the court's judgment. We agree with the mother and therefore reverse the order of the juvenile court and remand the case for further proceedings consistent with this opinion.

The relevant facts are largely undisputed and show that K. M. was born in January 2011. Although K. M.'s parents have never been married to each other, the

father has legitimated the child. Immediately after his birth, K. M. and his mother moved in with the mother's parents where they both remained until the mother moved out in October 2011. In September 2011, K. M.'s grandparents filed a petition in Camden County probate court seeking temporary guardianship of the child. The petition stated that the guardianship was needed because neither parent was financially stable, and each of K. M.'s parents consented to both the temporary guardianship and the appointment of the maternal grandparents as the temporary guardians. The probate court granted the petition the same day it was filed.

In March 2016, the mother filed a petition in Camden County Probate Court seeking to terminate her parents' temporary guardianship of K. M. After the grandparents filed an objection to the petition, the case was transferred to the juvenile court. The juvenile court heard evidence in the matter in June and September 2016 and appointed a guardian ad litem to represent K. M. The evidence presented at the hearing showed that during the initial years of K. M.'s life, the mother went through a period of instability where she lived in a number of different rental properties and worked a number of different jobs. Even during this period, however, the mother maintained contact with K. M. and was present in his life.

In April 2014, the mother married K. M.'s stepfather, who serves as a submariner in the U.S. Navy. At the time of the hearing, the couple had lived for two years in a three-bedroom townhouse, where K. M. had his own bedroom. At some point after her marriage, and at least one year prior to the June 2016 hearing, the mother began caring for K. M. and the mother's nine-year-old brother two days a week. One day a week the mother would also care for the mother's foster brother in addition to the other two children. For at least an entire year before the hearing, the mother had taken K. M. and the mother's brother and foster brother to their weekly speech therapy sessions, and the grandparents had allowed K. M. (and sometimes their other children) to spend the night with the mother and her husband once or twice a month.[1] Additionally, the mother's unrefuted testimony showed that in the year before the hearing, she picked up K. M. from school as many as four days a week and saw him as many as six days a week. The mother knew all of the child's teachers and

---

[1] After the mother filed the petition to terminate the guardianship, the grandparents discontinued overnight visits and cut back significantly on the amount of time the mother was allowed to spend with K. M.

physicians and she could also identify the child's medical issues and how to treat them.[2]

Although the mother did not pay child support for K. M., she did provide financial assistance to the guardians. Specifically, the mother and her husband gave her parents money, paid for K. M.'s speech therapy, and regularly paid for food and clothing for the child. Additionally, the mother provided the grandparents with the child support K. M.'s father paid to her. The mother had worked full-time until approximately nine months before the hearing. Because her work schedule changed from week to week, however, the mother quit her job to ensure she was available to get K. M. from school at least two days a week, thereby increasing her time with him and decreasing his time in day care. Although the mother was not currently employed outside the home, she testified that she and her husband could provide for K. M. and that doing so would not strain their resources.

Neither the mother nor her husband has a history of drug or alcohol use and the evidence showed that they did not drink and did not keep alcohol in their home.

---

[2] The medical issues included K. M.'s speech delays, occasional asthma, and difficulties having bowel movements. The speech delays are treated with speech therapy, the asthma is treated with an inhaler on an as-needed basis, and the intestinal issues are treated by providing the child with a daily fiber supplement.

Although the mother does smoke, she does so only outside and never around K. M. because of his issues with asthma.

The mother presented the testimony of a local police officer who described herself as the mother's "best friend." The friend lived less than two blocks from the mother and was in the mother's home frequently. According to the friend, the home was always clean and was an appropriate place for a child to live. The friend had observed the mother with K. M. on numerous occasions, noting that when the mother was with K. M. she usually had her youngest brother and sometimes her parents' foster child. According to the friend, K. M. appeared to love his mother, the mother took good care of K. M. and the other children when they were with her, and she had witnessed the mother giving K. M. his required medications. The friend had seen the mother engaging in activities with the children on a regular basis, including cooking, crafts, playing outside, and watching television.

A second friend of the mother offered similar testimony, saying that for approximately two years she had seen K. M. with his mother at least twice a week; that the mother frequently cared for her youngest brother while she was caring for K. M.; that the mother took good care of the children; and that the home was kept clean.

K. M.'s biological father testified that he supported termination of the guardianship and the return of custody to the mother, with the father having visitation.[3] The father indicated that at the time he and the mother consented to the guardianship, the understanding between the parties was that the guardianship would not be permanent, explaining, "[t]he whole point of the guardianship was due to our financial [in]stabilities. We're both in a better position [now] where we can handle our responsibilities."

The grandmother testified that she believed the guardianship should be continued because it was in the best interest of K. M. To support her position, the grandmother pointed to the facts that K. M. had a close bond with his grandparents and their youngest son; the grandparents lived on approximately three acres of land that provided K. M. with space to play, while the mother's home did not have a substantial yard; the grandparents had a number of animals on their property and K. M. experienced joy and satisfaction caring for the animals; K. M. was especially close

_____

[3] The father acknowledged that, at the request of the maternal grandparents, he had previously signed a statement saying that he opposed termination of the guardianship. The father explained that he wrote that statement based solely on information provided him by the grandparents and before he had spoken with K. M.'s mother. After speaking with the mother and learning the details about her living and financial situation, the father was of the opinion that custody should be returned to the mother.

6

to his dog and his horse, both of which lived on the property; that K. M. had become withdrawn after the mother filed her petition to terminate the guardianship; and that at the suggestion of K. M.'s pediatrician, the grandparents had begun taking K. M. to a therapist.[4]

Although the grandmother acknowledged that over the course of K. M.'s life, the mother had "grown up" significantly, she also indicated that she had concerns about the stability of the mother's marriage. In support of their claims of potential marital instability, the grandparents introduced evidence showing that approximately 18 months before the hearing, in January 2015, the mother and her husband had an argument, during which the mother kicked the husband. Although some limited physical contact occurred during the argument, police were not called and no incident report was filed. According to the mother and her husband, it was the only major argument the couple had ever had; it did not occur in front of K. M.; and the couple had learned from the experience. The husband described the argument as "a newly [married] thing," while the mother testified that the argument "was stupid" and "made

---

[4] No evidence was introduced as to any diagnosis, findings, or recommendations made by the therapist.

7

us realize a lot of things," and that "we talk better now and we communicate better now."

The court-appointed guardian ad litem ("GAL") filed a written report based on his review of the record and his interviews with the parties. The GAL expressed his belief that if the guardianship was terminated immediately there was a "possible threat" of emotional or physical harm to K. M. that would be "more than just the emotional toll that comes from a change in living arrangements." In support of this conclusion, the GAL cited the strong psychological bond K. M. had with his grandparents and their youngest son; the "sporadic" contact between K. M. and his mother "until recently"; and K. M.'s unique medical needs that [his grandparents] are well able to handle while [the mother] is still learning."

The GAL further noted that "*it remains to be seen whether . . .* there would be probable cause of likely abuse, neglect, or abandonment of the child if the guardianship were terminated." (Emphasis supplied.) The GAL also expressed concern that the mother's stability depended in large part on her marriage. He opined that in the absence of the marriage, there was probable cause to believe that K. M. would be at risk of abuse, neglect, or abandonment in the custody of the mother. The GAL stated that "there has not been enough time to know whether the [mother's]

relationship with [her husband] is a true lasting one or just another fling like she has had in the past."

The GAL acknowledged that all parties (including the grandparents) agreed that "at some point" custody of K. M. needed to be returned to the mother. The GAL therefore recommended a continuation of the guardianship for some period of time, while the case moved forward as a dependency proceeding, with the court retaining jurisdiction and formulating a permanency plan to transition K. M. to his mother's custody.[5] See OCGA § 15-11-100 et seq.

When giving his oral report to the court on the final day of the hearing, the GAL expressed the same opinions set forth in his written report. And during his oral report, the GAL stated that the guardianship would have to be terminated in the absence of "a showing of probable cause of possible abandonment, neglect, or abuse"

---

[5] The GAL's recommendation with respect to the case continuing as a dependency proceeding reflects the mandate of OCGA § 15-11-14 (c) (2), which provides that if a court determines "[t]hat is in the best interests of a child that the temporary guardianship be continued *over the parent's objection*," then the "case *shall* proceed as a dependency matter pursuant to the provisions of Article 3 of [the Juvenile Code]." (Emphasis supplied.) Although the court below continued the guardianship over the objections of both K. M.'s parents, there is nothing in the order to show that the court applied OCGA § 15-11-14 (c) (2)'s requirement that the case proceed as a dependency matter.

9

of K. M. in his mother's custody. The court responded that "probable cause is a very weak standard . . . [i]t's almost at the bottom of the scale."

Following the hearing, the juvenile court entered a one-page order that contained no findings of fact or conclusions of law. Instead, the order summarily denied the mother's petition, stating that "[t]he Court determined pursuant to OCGA § 15-11-14 (b) (1) that it is in the best interest of the child" to continue the temporary guardianship. The mother now appeals from that order.

1. Although the juvenile court's order does not articulate the evidentiary standard it applied to determine the best interests of K. M., the record reflects the court's belief that it could continue the guardianship if "probable cause" existed to believe that K. M. would suffer harm if custody were returned to the mother. The mother contends that "probable cause of harm" represents the wrong standard for determining the best interest of the child under OCGA § 15-11-14. The plain and unambiguous statutory language at issue shows that the mother is correct.

The mother filed her petition to terminate the guardianship under OCGA § 29-2-8, which provides, in relevant part:

> Either natural guardian of the minor may at any time petition the court
> to terminate a temporary guardianship; provided, however, that notice

10

of such petition shall be provided to the temporary guardian. If no objection to the termination is filed by the temporary guardian within ten days of the notice, the court shall order the termination of the temporary guardianship. If the temporary guardian objects to the termination of the temporary guardianship within ten days of the notice, the court shall have the option to hear the objection or transfer the records relating to the temporary guardianship to the juvenile court, which shall determine, after notice and hearing, *whether a continuation or termination of the temporary guardianship is in the best interest of the minor*.

OCGA § 29-2-8 (b). (Emphasis supplied.)

Following transfer of the case to the juvenile court, the petition proceeded under OCGA § 15-11-14, which provides:

(a) The court shall hold a hearing within 30 days of receipt of a case transferred from the probate court pursuant to . . . Subsection (b) of Code Section 29-2-8.
(b) After notice and hearing, the court may make one of the following orders:
(1) That the temporary guardianship be established or continued if the court determines that the temporary guardianship is in the best interests of a child. The order shall thereafter be subject to modification only as provided in Code Section 15-11-32; or
(2) That *the temporary guardianship be terminated if the court determines it is in the best interests of a child. A child shall be returned to his or her parent unless the court determines that there is probable*

11

*cause to believe that he or she will be abused, neglected, or abandoned in the custody of his or her parent.*

(c) A case shall proceed as a dependency matter pursuant to the provisions of Article 3 of this chapter if, after notice and hearing, the court determines:

(1) That it is in the best interests of a child that the temporary guardianship not be established or that the temporary guardianship be terminated but there is probable cause to believe that he or she will be abused, neglected, or abandoned if returned to his or her parent; or

(2) That it is in the best interests of a child that the temporary guardianship be continued over the parent's objection.

OCGA § 15-11-14 (emphasis supplied).

Although we have not been called upon previously to interpret OCGA § 15-11-14, the unambiguous language of that statute makes clear that a juvenile court deciding a petition to terminate a temporary guardianship must engage in a two-step analysis. First, the court must determine whether termination or continuation of the guardianship is in the best interest of the child. Second, if the court finds that termination is in the best interest of the child, custody must be returned to the child's parent unless the juvenile court finds "probable cause to believe" that the child "will be abused, neglected, or abandoned" while in parental custody. OCGA § 15-11-14 (b) (2). If, however, the juvenile court continues a temporary guardianship over the

12

objection of the parents, the court is required to retain jurisdiction and have the case "proceed as a dependency matter pursuant to" OCGA §15-11-100 et seq. See OCGA § 15-11-14 (c) (2).

Here, instead of applying the "the clear and convincing evidence" standard to determine the best interest of the child, the juvenile court erroneously applied the "probable cause" standard (which is to be used in determining whether a child whose guardianship has been terminated should be returned to his parent's custody). And as shown below, in the context of a custody dispute between a child's natural parents and third parties, the "best interest of the child" standard requires a showing of more than probable cause. Furthermore, the burden of satisfying this stringent standard rests on the third party who is seeking to obtain or maintain custody of the child.

In *Boddie v. Daniels*, 288 Ga. 143 (702 SE2d 172) (2010), a mother seeking to terminate a third party's temporary guardianship of her child challenged the constitutionality of the best interest of the child standard set forth in OCGA §29-2-8

(b).[6] The mother's challenge relied on the fact that under both the United States and Georgia Constitutions, parents have a right "to the care and custody of their children." *Clark v. Wade*, 273 Ga. 587, 596 (IV) (544 SE2d 99) (2001) (plurality opinion). "This right to the custody and control of one's child is a fiercely guarded right that should be infringed upon only under the most compelling circumstances." Id. at 596-597 (IV) (punctuation and footnote omitted). See also *Troxel v. Granville*, 530 U. S. 57, 65 (II) (120 SCt 2054, 147 LE2d 49) (2000) (plurality opinion) (the constitutional right of parents to "the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court") (punctuation omitted); *In the Interest of M. F.*, 298 Ga. 138, 145 (780 SE2d 291) (2015) ("there can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent" to guide "the care, custody, and management of their children") (citations and punctuation omitted). Accordingly, whenever a third party challenges

---

[6] At the time *Boddie* was decided, there existed no provision in the juvenile code addressing termination of a temporary guardianship, and the juvenile court decided those cases under the best interest of the child standard found in OCGA § 29-2-8. In 2014, however, Georgia's new juvenile code became effective, including OCGA § 15-11-14, which sets forth the procedure and standard for deciding a petition to terminate a temporary guardianship transferred to the juvenile court under OCGA § 29-2-8. As explained more fully below, we find that "the best interest of the child" standard included in OCGA § 15-11-14 is the same as "the best interest of the child" standard found in OCGA § 29-2-8.

a natural parent's right to custody of his or her child, that party must overcome three constitutionally based presumptions in favor of parental custody: "(1) the parent is a fit person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent." *Clark*, 273 Ga. at 593 (II). See also *Troxel*, 530 U. S. at 68 (II) (noting the constitutional presumption that "fit parents act in the best interests of their children"); *Brawner v. Miller*, 334 Ga. App. 214, 216 (1) (778 SE2d 839) (2015).

The mother in *Boddie* argued that because the best interest of the child standard did not require an affirmative showing of parental unfitness, it violated her constitutional right to control the upbringing of her child. The trial court disagreed and denied the mother's petition, finding "by a preponderance of the evidence that the best interests of the child [would] be served by continuing the temporary guardianship." 288 Ga. at 144. The Supreme Court of Georgia reversed, finding that the juvenile court had applied both the wrong evidentiary standard and the wrong

legal standard. Relying on its prior plurality opinion in *Clark*,[7] the Court found that the best interest of the child standard would not violate the Constitution provided it was construed narrowly. Thus, the Court held that the best interest of the child standard

> as found in OCGA § 29-2-8 (b) must be interpreted to mean that the third party must prove by *clear and convincing evidence* that the child will suffer physical or emotional harm if custody were awarded to the biological parent by terminating the temporary guardianship. Once this

---

[7] *Clark* addressed the constitutionality of the best interest of the child standard found in OCGA § 19-7-1 (b.1), which applies in custody actions between a natural parent and the child's grandparent, great-grandparent, aunt, uncle, great aunt, great uncle, sibling, or adoptive parent. The statute provides that in such cases,

> parental power may be lost by the parent, parents, or any other person if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption [in favor of parental custody], but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children. The sole issue for determination in any such case shall be what is in the best interest of the child or children.

OCGA § 19-7-1 (b.1).

16

showing is made, the third party must then show that continuation of the temporary guardianship will best promote the child's welfare and happiness.

*Boddie*, 288 Ga. at 146 (punctuation omitted; emphasis supplied), quoting *Clark*, 273 Ga. at 599 (V).

Harm in this context is defined as "either physical harm or significant, long-term emotional harm; [it does] not mean merely social or economic disadvantages." *Boddie*, 288 Ga. at 146 (citation and punctuation omitted). See also *Clark*, 273 Ga. at 598 (IV) (holding that evidence showing that a child will suffer some emotional distress does not meet the "rigorous harm" standard and noting "that the death of a parent, divorce, or change in home and school will often be difficult for a child, but some level of stress and discomfort may be warranted when the goal is reunification of the child with the parent"); *Floyd v. Gibson*, 337 Ga. App. 474, 478 (788 SE2d 84) (2016) (the rigorous harm standard "requires a showing by the third-party that a child *will* suffer physical or emotional harm if custody were awarded to the biological parent, not that harm 'may' result") (punctuation omitted, emphasis in original). And in determining whether the child will suffer actual harm, a trial court must consider

17

the factors set forth by the Georgia Supreme Court in *Clark*. See *Boddie*, 288 Ga. at 146. Those factors are

> (1) who are the past and present caretakers of the child; (2) with whom has the child formed psychological bonds and how strong are those bonds; (3) have the competing parties evidenced interest in, and contact with, the child over time; and (4) does the child have unique medical or psychological needs that one party is better able to meet.

*Clark*, 273 Ga. at 598-599 (IV) (footnotes omitted).

We find that the best-interest-of-the-child standard articulated in *Clark* and *Boddie* applies to cases decided under OCGA § 15-11-14. The same constitutional concerns that led the Supreme Court of Georgia to interpret narrowly the best-interest-of-the-child standard found in both OCGA § 29-2-8 and OCGA § 19-7-1 (b.1) also exist with respect to petitions decided under OCGA § 15-11-14. Accordingly, we find that in deciding a petition to terminate the temporary guardianship pursuant to this statute, a juvenile court must determine whether there is clear and convincing evidence that termination would cause the child either "physical harm or significant, long-term emotional harm." *Boddie*, 288 Ga. at 146 (citation and punctuation omitted). And in making this determination, the court must bear in mind that the burden of coming forward with clear and convincing evidence

18

is on the party opposing the termination. Id. Thus, the juvenile court in this case erred when it applied the "probable cause of harm" standard to determine whether termination was in the best interest of K. M. Id. (noting that the best interest of the child standard must be applied "so as to ensure that the temporary guardianship will be continued only when a real threat of harm would result from termination") (citation and punctuation omitted).

2. The mother contends that when the correct legal standard is applied, the grandparents failed to show by clear and convincing evidence that it was in the best interest of K. M. to continue the temporary guardianship. We agree that the current record contains no clear and convincing evidence that termination of the guardianship would cause K. M. physical or long-term emotional harm.[8] See *Clarke v. Cotton*, 207

---

[8] To the extent that the juvenile court was basing its decision on the conclusions of the guardian ad litem, we note that most of those conclusions were unsupported by the available evidence. Specifically, the GAL's statement that "until recently" contact between K. M. and his mother had been "sporadic" ignores the fact that for approximately two years before the GAL filed his report, the mother regularly cared for the child at least two days a week. It also fails to acknowledge the fact that the grandparents had admittedly limited the mother's contact with K. M. Nor does the record support the GAL's conclusion that K. M. has "unique medical needs that [his grandparents] are well able to handle while [the mother] is still learning." Assuming that speech delays, occasional asthma, and difficulty with bowel movements could be considered "unique medical conditions," all the evidence of record, including the testimony of the grandmother, shows not only that the mother knows how to treat these issues, but that she has successfully treated the child in the past. Finally, the

Ga. App. 883, 884 (429 SE2d 291) (1993) (under Georgia law,"'clear and convincing evidence' is 'an intermediate standard of proof' . . . which is greater than the preponderance of the evidence standard ordinarily employed in civil proceedings, but less than the reasonable doubt standard applicable in criminal proceedings"), quoting *Santosky v. Kramer*, 455 U. S. 745, 756 (II) (102 SCt 1388, 71 LEd2d 599) (1982). See also *In the Interest of J. V. J.*, 329 Ga. App. 421, 428 (765 SE2d 389) (2014) ("the juvenile court's preference that [custody of a child] remain with [someone other than her natural parents] is wholly without consequence, [where] the court lack[s] clear and convincing evidence" to support that decision).

We recognize, however, that it has been over a year since the juvenile court heard this case. Accordingly, if the grandparents continue to oppose the termination on remand, we leave it for the juvenile court to consider any additional, more recent evidence that may be available regarding the best interest of K. M., with that

GAL's observation that "there has not been enough time to know whether the [mother's] relationship with [her husband] is a true lasting one or just another fling like she has had in the past," borders on the nonsensical. At the time the GAL drew this conclusion, the mother had been married for over two and a half years. By any standard, a relationship of that duration cannot be classified as a romantic "fling."

20

consideration to include the factors set forth by the Supreme Court in *Clark*.[9] And we emphasize that to continue the guardianship, the grandparents must come forward with clear and convincing evidence that termination *will* cause K. M. "physical harm or *significant, long-term* emotional harm." *Boddie*, 288 Ga. at 146 (emphasis supplied). See also *Floyd*, 337 Ga. App. at 478 (a showing that physical or long-term emotional harm might result is insufficient to meet the best interest of the child standard). If the grandparents meet this initial evidentiary burden, they would then need to show that "continuation of the . . . guardianship will best promote [K. M.'s] welfare and happiness." *Boddie*, 288 Ga. at 146 (citation and punctuation omitted).

Finally, should the juvenile court again deny the mother's petition, it shall enter an order sufficient to provide this Court with an adequate basis for review. Additionally, if the juvenile court continues the guardianship over the objection of either parent, the case shall proceed as a dependency matter pursuant to Article 3 of the Juvenile Code. See OCGA § 15-11-14 (c) (2).

---

[9] In considering those factors, the juvenile court must also consider to what extent the mother's contact with and opportunity to parent K. M. have been limited by the grandparents.

21

For the reasons set forth above, the order of the juvenile court denying the mother's petition to terminate the temporary guardianship of K. M. is reversed. The case is remanded for further proceedings consistent with this opinion.

*Judgment reversed and case remanded with direction. McFadden, P. J., and Bethel, J., concur*.