**FIRST DIVISION
BARNES, P. J.,
BROWN and HODGES, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**May 4, 2022**

# In the Court of Appeals of Georgia

A22A0092. IN THE INTEREST OF B. M. R., a child.

HODGES, Judge.

In an "Order of Adjudication and Temporary Disposition," the Juvenile Court of Toombs County adjudicated 9-year-old B. M. R. dependent, dissolved her paternal grandmother's temporary guardianship, and awarded B. M. R.'s temporary custody to the Georgia Department of Family and Children Services ("DFCS"). B. M. R.'s paternal grandmother ("Grandmother") appeals from the juvenile court's order, arguing that the evidence did not support a finding that terminating her guardianship was in B. M. R.'s best interest. Finding no error, we affirm.

Viewed in a light most favorable to the juvenile court's judgment,[1] the record reveals that Grandmother had custody of B. M. R. from the time she was nine days old; at the time of the hearing in July 2021, B. M. R. was 9 years old.[2] Between 2017 and 2020, B. M. R. transferred between two local school districts six times and had a pattern of truancy. For example, on the six occasions B. M. R. registered at one elementary school, she withdrew each time between one day and four months later. In an enrollment period that began March 19, 2018, the school withdrew B. M. R. on April 26, 2018 due to lack of attendance. During an early 2020 enrollment period, B. M. R. had 20 unexcused absences. Throughout this three-year period, schools attempted to reach Grandmother on several occasions, both by telephone and in person, with only limited success. As early as December 2019, school officials

---

[1] See *In the Interest of R. D.*, 346 Ga. App. 257, 259 (1) (816 SE2d 132) (2018) ("[W]e review [a] juvenile court's finding of dependency in the light most favorable to the lower court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child is dependent. In making this determination we neither weigh the evidence nor judge the credibility of the witnesses, but instead defer to the factual findings made by the juvenile court, bearing in mind that the juvenile court's primary responsibility is to consider and protect the welfare of a child whose well-being is threatened.") (citation and punctuation omitted).

[2] B. M. R.'s mother's whereabouts were unknown at the time of the January 2021 hearing, and she had never been involved in B. M. R.'s life.

discussed B. M. R.'s academic struggles with Grandmother, noting that B. M. R. demonstrated deficits in reading, reading comprehension, and writing; was behind in completing assignments and homework; and was below grade level in mathematics. A school social worker confirmed that B. M. R.'s excessive absences "most definitely" had "a negative effect on [B. M. R.'s] ability to learn," and a second counselor agreed that B. M. R.'s constant relocation "had a negative impact upon her academic performance[.]"

In September 2020, DFCS received a report from B. M. R.'s school detailing her chronic absenteeism and resulting academic struggles. In particular, despite being enrolled in remote learning, B. M. R. had only completed one assignment and had not logged in for class in six weeks, missing 29 days of school. By October 2020, B. M. R. had returned to in-person classes, but continued to accumulate absences.

As a result of her ongoing excessive absences, B. M. R. had to repeat kindergarten, struggled with mathematics and with reading at a kindergarten level, and was in danger of repeating second grade. Moreover, B. M. R. also had diagnosed mental illnesses for which she received medication but no counseling.

During the latter half of 2020, B. M. R. moved at least six times. Compounding B. M. R.'s housing instability and resulting truancy, Grandmother suffered from

3

bipolar disorder with psychotic features, PTSD, and anxiety disorder which compromised her parental abilities. Grandmother received medication assistance, but did not obtain any ongoing counseling services.

The State filed a dependency petition to terminate Grandmother's guardianship due to her failure to meet B. M. R.'s educational needs, provide B. M. R. with stable housing, or to take advantage of counseling services to address her mental illnesses. Following her placement with a paternal aunt in late October 2020 to the time of the February 2021 hearing, B. M. R.'s attendance and academic performance improved. A DFCS case worker testified that, in view of Grandmother's neglect of B. M. R.'s educational and stable housing needs, it would be harmful to return B. M. R. to Grandmother's care. Both B. M. R.'s guardian ad litem and a CASA representative agreed that B. M. R. should remain with her aunt, with Grandmother allowed supervised visitation to help calm B. M. R.'s separation anxiety.

The juvenile court found that B. M. R. had been "abused or neglected and [was] in need of the protection of the Court[,]" that B. M. R.'s continued placement with Grandmother would be contrary to B. M. R.'s welfare and would not be in B. M. R.'s best interest, that Grandmother could exercise supervised visitation with B. M. R., and that while B. M. R.'s father could also exercise supervised visitation, B. M.

4

R.'s placement with him would not be in her best interest at that time due to his domestic violence and incarceration concerns.[3]

As a result, the juvenile court adjudicated B. M. R. dependent, dissolved Grandmother's temporary guardianship, and awarded temporary custody of B. M. R. to DFCS. The juvenile court also implemented a permanency plan with the goal of reunifying B. M. R. and her father. This appeal followed.

In a single enumeration of error, Grandmother contends that there was insufficient evidence to demonstrate that terminating her guardianship over B. M. R. was in B. M. R.'s best interest. We disagree.

Georgia law provides that "the juvenile court may place a minor child in the protective custody of the Department where the State shows, by clear and convincing evidence, that the child is a dependent child.[4] . . . The Juvenile Code defines 'dependent child,' in relevant part, as a child who has been abused or neglected and is in need of the protection of the court." (Citations and punctuation omitted.) *In the*

---

[3] At a hearing, the father stipulated to his then inability to provide stable housing for B. M. R. and to his criminal history, which would preclude B. M. R.'s placement with him.

[4] See OCGA § 15-11-180 (providing that the State bears "the burden of proving the allegations of a dependency petition by clear and convincing evidence").

*Interest of M. S.*, 352 Ga. App. 249, 257 (834 SE2d 343) (2019). "Neglect" is defined, in relevant part, as "[t]he failure to provide proper parental care or control, subsistence, *education as required by law*, or other care or control necessary for a child's physical, mental, or emotional health or] morals[.]" (Emphasis supplied.) OCGA § 15-11-2 (48) (A). Of note, "[t]here is no statutory requirement . . . that specific harm must support a finding that a child is [dependent] because of the child's failure to receive the education required by law." *In the Interest of J. C.*, 264 Ga. App. 598, 600 (1) (591 SE2d 475) (2003). However,

> even a temporary loss of custody is not authorized unless there is clear and convincing evidence that the dependency resulted from unfitness on the part of the parent [or guardian], that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.

(Citation omitted.) *In the Interest of M. S.*, 352 Ga. App. at 258. Therefore, "[p]arental [or guardian] unfitness, like dependency, . . . must be proved by clear and convincing evidence." (Citation and punctuation omitted.) Id.; see also *Boddie v. Daniels*, 288 Ga. 143, 145 (702 SE2d 172) (2010) (noting "the common attributes of custody and guardianship"). Moreover,

6

in deciding a petition to terminate [a] temporary guardianship . . ., a juvenile court must determine whether there is clear and convincing evidence that termination would cause the child either 'physical harm or significant, long-term emotional harm.' And in making this determination, the court must bear in mind that the burden of coming forward with clear and convincing evidence is on the party opposing the termination.

(Citations and punctuation omitted.) *In the Interest of K. M.*, 344 Ga. App. 838, 846-847 (1) (811 SE2d 505) (2018); see also *Boddie*, 288 Ga. at 146 (holding that the "best interest" standard "must be narrowly interpreted to mean that the third party must prove by clear and convincing evidence that the child will suffer physical or emotional harm . . . by terminating the temporary guardianship").

To these ends, OCGA § 15-11-26 provides that

[w]henever a best interests determination is required, the court shall consider and evaluate all of the factors affecting the best interests of the child in the context of such child's age and developmental needs. Such factors shall include:

(1) The physical safety and welfare of such child, including food, shelter, health, and clothing;

(2) The love, affection, bonding, and emotional ties existing between such child and each parent or person available to care for such child;

7

. . .

(4) Such child's need for permanence, including such child's need for stability and continuity of relationships with his or her parent, siblings, other relatives, and any other person who has provided significant care to such child;

(5) Such child's sense of attachments, including his or her sense of security and familiarity, and continuity of affection for such child;

(6) The capacity and disposition of each parent or person available to care for such child to give him or her love, affection, and guidance and to continue the education and rearing of such child;

(7) The home environment of each parent or person available to care for such child considering the promotion of such child's nurturance and safety rather than superficial or material factors;

. . .

(9) The mental and physical health of all individuals involved;

(10) The home, school, and community record and history of such child, as well as any health or educational special needs of such child;

. . .; and

(20) Any other factors considered by the court to be relevant and proper to its determination.

In this case, we conclude that clear and convincing evidence demonstrated that B. M. R. was a dependent child and that B. M. R.'s dependency resulted from Grandmother's unfitness. We further conclude that Grandmother failed to show that terminating the temporary guardianship would cause B. M. R. physical harm or significant, long-term emotional harm. B. M. R. had a long history of truancy while in Grandmother's care which profoundly negatively affected B. M. R.'s education. B. M. R. transferred between local schools multiple times during a three-year period, withdrawing as soon as one day later and not staying longer than four months at one time. During one such period, B. M. R. enrolled on March 19, 2018, but was withdrawn by the school on April 26, 2018 due to lack of attendance. Similarly, B. M. R. had 20 unexcused absences in an early 2020 enrollment. While enrolled in remote learning, B. M. R. had only completed one assignment and had not logged in for class in six weeks, missing 29 days of school. The schools' repeated attempts to reach Grandmother about B. M. R.'s attendance were largely unsuccessful. The result of B. M. R.'s truancy were definitive deficits in reading, reading comprehension,

writing, and mathematics. In short, B. M. R.'s absences "most definitely" had "a negative effect on [B. M. R.'s] ability to learn[.]"

Grandmother offered little defense for B. M. R.'s history of poor attendance, acknowledging at one point that it was her fault because she "let [B. M. R.] basically dictate what she wanted to do for school, instead of . . . telling her. . . ." She also attributed B. M. R.'s lack of attendance during virtual sessions to her own unfamiliarity with computers and claimed that some of B. M. R.'s absences were the result of Grandmother's inability to "run real fast" when B. M. R. missed the school bus. Grandmother also felt that B. M. R. had learning disabilities and should have been tested for autism, but agreed that B. M. R. was behind academically and that constantly moving was not good for her.[5] During the hearing, Grandmother pleaded to retain custody of B. M. R., saying, "she's all I've got left[.]"[6]

[5] In her brief in this Court, Grandmother acknowledges that the concerns expressed by DFCS and the juvenile court "are not baseless" and that there have been "truancy issues, stable housing issues, and . . . mental health issues. . . ." However, Grandmother proffered no expectation that B. M. R.'s situation would improve, nor did she contradict the overwhelming evidence that Grandmother's inability to provide stable housing was a direct component of her failure to provide for B. M. R.'s educational needs, resulting in her academic struggles.

[6] At the conclusion of the hearing, the trial court acknowledged that Grandmother and B. M. R. formed a bond and noted the importance of maintaining the bond. This observation by the trial court occurred within the context of awarding

Accordingly,

[b]ecause of [B. M. R.'s] high number of unexcused absences from school, the extended period during which [she] continued to miss school, and [Grandmother's] unwillingness to talk with the school representative about [B. M. R.'s] truancy, we conclude that a rational trier of fact could have found by clear and convincing evidence that [B. M. R. was] not receiving the education required by law and [was dependent] for that reason.

*In the Interest of J. C.*, 264 Ga. App. at 600 (1); see also *In the Interest of J. D.*, 362 Ga. App. 298, 299 (2) (— SE2d —) (2022); *In the Interest of A. L.*, 313 Ga. App. 858, 860 (723 SE2d 76) (2012). Therefore, we affirm the trial court's order of adjudication.

*Judgment affirmed. Barnes, P. J., and Brown, J., concur.*

---

Grandmother visitation with B. M. R., which was included as part of the trial court's adjudication order in order to preserve the bond and to address B. M. R.'s separation anxiety. It therefore appears, contrary to Grandmother's suggestion, that the trial court considered the parties' bond as part of its required best interests analysis and that, despite the bond, clear and convincing evidence demonstrated that B. M. R.'s continued placement with Grandmother was not in her best interest. See OCGA § 15-11-26 (5).