**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

May 23, 2024

# In the Court of Appeals of Georgia

A24A0061, A24A0062. GEIGER v. ALLMOND (two cases).

DOYLE, Presiding Judge.

In these consolidated cases, Ashley Geiger ("the Mother") appeals from an order granting permanent custody of her two minor children to Patti Allmond, the children's paternal grandmother ("the Grandmother"). She contends that the evidence was insufficient to support the custody award under the standard in OCGA § 19-7-1 (b.1). Based on the record before us, we agree.

When reviewing an order in a child custody case, we view the evidence in the light most favorable to the trial court's decision. We will not set aside the trial court's factual findings if there is any evidence to support them, and we defer to the trial court's credibility

determinations. We review de novo, however, the legal conclusions the trial court draws from the facts.[1]

So viewed, the record shows that the Mother was in a relationship with the children's father, Travis Wells ("the Father"), for 22 years, but they never married. Throughout this time, they were "toxic from the start" and had difficulties in their relationship. Despite this, they had two children, a son born in 2010, and a daughter born in 2014. The Mother was the primary caregiver.

Eventually, the relationship soured to the point that in April 2021, the Mother fled what she called a verbally and emotionally abusive relationship and left the family home with the children, moved in with the maternal grandmother in Florida, approximately six or seven hours away by car. Soon thereafter, the Father filed a legitimation petition, and in July 2021, a consent order on legitimation was entered, granting the Father primary physical custody with the parents having joint legal custody, and the Mother having weekend visitation once per month. The Mother was pro se at the time.

---

[1] (Punctuation omitted.) *Williams v. Phillips*, 368 Ga. App. 371 (890 SE2d 125) (2023), quoting *Mashburn v. Mashburn*, 353 Ga. App. 31, 32 (836 SE2d 131) (2019).

By November 2021, the Father had denied the Mother visitation, so the Mother filed a motion for contempt, seeking to enforce her visitation rights.[2] The following month, the Father filed an emergency petition to modify custody and suspend the Mother's visitation based on his suspicion that the daughter had been sexually abused.[3] The Father had learned that the maternal grandmother's boyfriend was living in the house where the Mother was staying, the boyfriend had a conviction for sexual battery of a minor, and the couple's daughter had complained of a molluscum infection on various parts of her body. The daughter was physically examined and a forensic interview was conducted; no allegations of abuse were disclosed or confirmed. The physical exam concluded that the molluscum was common in children and of an indeterminate cause, and the Mother explained that the daughter had suffered from it prior to any interaction with the boyfriend.

Following this process, the Mother was temporarily awarded custody of the children, but eventually offered to give custody of the children to the Grandmother, who ultimately, due to the order awarding the Father temporary custody in July 2021,

---

[2] That action was docketed in this Court as Case No. A24A0061.

[3] That action was docketed in this Court as Case No. A24A0062 and has been consolidated with Case No. A24A0061.

became the children's primary caregiver for the approximate year and a half before the final hearing.

In March 2022, the court appointed a guardian ad litem ("GAL"), and shortly before the GAL's report was issued, the Grandmother filed a motion to intervene and a petition to obtain primary custody of the children.[4] In December 2022, the trial court held an evidentiary hearing on the Grandmother's motion to intervene and petition for custody, as well as the Mother's contempt motion and the Father's motion to modify custody. During the hearing, the GAL testified and recommended that primary physical custody be awarded to the Mother; the Mother, Father, and Grandmother also testified. Thereafter, the trial court entered an order granting the Grandmother's motion to intervene, awarding permanent custody to the Grandmother with visitation to the Mother and Father on alternating weekends.

The Mother now appeals and argues that the evidence was insufficient to support the custody award to a third-party under OCGA § 19-7-1 (b.1). Based on the record before us, we agree.

OCGA § 19-7-1 (b.1) provides as follows:

---

[4] That action is a part of Case No. A24A0061.

Notwithstanding . . . any other law to the contrary, in any action involving the custody of a child between the parents or either parent and a third party limited to grandparent [and other relatives], parental power may be lost by the parent . . . if the court hearing the issue of custody, in the exercise of its sound discretion and taking into consideration all the circumstances of the case, determines that an award of custody to such third party is for the best interest of the child or children and will best promote their welfare and happiness. There shall be a rebuttable presumption that it is in the best interest of the child or children for custody to be awarded to the parent or parents of such child or children, but this presumption may be overcome by a showing that an award of custody to such third party is in the best interest of the child or children. The sole issue for determination in any such case shall be what is in the best interest of the child or children.

Thus, the Code establishes

a rebuttable presumption that it is in the best interest of a child to award custody to the parent of the child. To overcome this presumption, *a third-party relative must show, with clear and convincing evidence, that the child will suffer either physical harm or significant, long-term emotional harm if custody is awarded to the parent.* In addressing the issue of harm, trial courts must consider a variety of factors beyond biological connection or generalized notions of parental fitness. They also must consider the parental needs and the circumstances of the child in question, including (1) who are the past and present caretakers of the child or children; (2) with whom has the child or children formed psychological bonds and

how strong are these bonds; (3) have the competing parties evidenced interest in, and contact with, the child or children over time; and (4) are there any unique medical or psychological needs of the child or children.[5]

With respect to the harm in this context, it must meet the above standard and not be

merely social or economic disadvantages. Thus, under Georgia law, the focus of such a determination of unfitness must be the parent's ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent, and *a court is not permitted to terminate a parent's natural right to custody merely because it believes that the children might have better financial, educational, or moral advantages elsewhere, that is, the parent's ability to raise her children is not to be compared to the fitness of a third person*.[6]

---

[5] (Citations and punctuation omitted; emphasis supplied.) *Strickland v. Strickland*, 298 Ga. 630, 631 (1) (783 SE2d 606) (2016), citing *Clark v. Wade*, 273 Ga. 587, 598-599 (IV) (544 SE2d 99) (2001).

[6] (Citations and punctuation omitted; emphasis supplied.) *Jewell v. McGinnis*, 346 Ga. App. 733, 736 (1) (816 SE2d 683) (2018), quoting *Floyd v. Gibson*, 337 Ga. App. 474, 476-477 (1) (788 SE2d 84) (2016). See also *Mashburn*, 353 Ga. App. at 43 (1) (emotional harm does not "refer to the stress and discomfort that naturally accompanies a change in home and/or school"); *In the Interest of K. M.*, 344 Ga. App. 838, 845 (1) (811 SE2d 505) (2018) ("[W]henever a third party challenges a natural parent's right to custody of his or her child, that party must overcome three constitutionally based presumptions in favor of parental custody: (1) the parent is a fit

Here, the trial court based its judgment on findings that the Mother:

[left] the children alone with a convicted sexual predator, . . . contrary to medical advice removed the minor children from doctor prescribed medication, which resulted in severe mental and physical health issues for [the son], . . . failed to provide necessities for the children, has gone prolonged periods without speaking to the children, and has constantly put her interest before the children's. [The Mother] also returned the children to [the Grandmother] multiple times during her parenting time, admitting that she cannot care for the children. Furthermore, [the Mother] continues to use illegal substances. At this time, [the Mother] poses a significant danger to the minor children's physical and emotional well being.

The Mother challenges these findings, and we address each one below.

(a) *Mother's drug use*. With respect to the Mother's drug use, she conceded that she had used drugs in the past, and there was evidence that during her relationship with the Father she smoked marijuana on a daily basis. But the Mother explained that she had not used drugs since early 2021, and this was confirmed by a negative hair follicle drug test in July 2021. On the other hand, the Grandmother candidly admitted

---

person entitled to custody, (2) a fit parent acts in the best interest of his or her child, and (3) the child's best interest is to be in the custody of a parent."), citing *Clark*, 273 Ga. at 593 (II).

that she had sought treatment at least twice for an addiction to prescription pills. She appeared to have no current issues with abuse, but she conceded that she currently takes klonopin daily and a "Tylenol Number 3" as needed for neck pain, pursuant to active prescriptions. The GAL expressed no concern with either the Mother's or the Grandmother's current substance use, and the Mother was the only party to have submitted to drug testing in the recent time frame. Further, since the parents separated, the Mother's situation has stabilized — she has married,[7] has an appropriate residence, and has a full-time salaried job as a production manager. This record fails to demonstrate, by clear and convincing evidence, that the Mother's past or present drug use will cause physical or significant long term emotional harm to the children.

(b) *Exposure to a "sexual predator."* There was evidence that immediately after leaving the Father, the Mother moved to Florida to live with the maternal grandmother, who had a live-in boyfriend with a conviction for sexual battery. The Mother successfully objected to admission of the uncertified conviction showing that the offense was against a victim under the age of 12, so beyond the fact that he was

_____

[7] The Mother's husband testified that he would embrace his role as a stepfather, and he welcomed the prospect of the Mother's custody.

referred to as a "registered sex offender" during the hearing, there was no evidence regarding the nature of the crime or the victim, and there were no legal requirements that he could not be around children. The Mother agreed that she knew of the boyfriend's criminal history and that allowing him around the children was a lapse in her judgment, but she explained that she was escaping the verbally and emotionally abusive environment in her family home, she slept with the children in her room, and the boyfriend was never left alone with the children. The GAL reviewed some of the communications between the Father and Mother during their separation, and he corroborated the Mother's account of the environment, stating that the Father's conduct during video chats was "very alarming . . . Dad cannot control his temper when speaking to Mom in the presence of the children . . . I've never seen such behavior targeted at the mother so directly, and that's the worst of the worst that I'm describing." There was no evidence that the children were alone with the boyfriend, and there were no actual findings of abuse or outcries of abuse by the daughter. Further, as stated above, the Mother had established a stable life away from the maternal grandmother and understood how to ensure the children's welfare in this context. This record does not support a finding, by clear and convincing evidence, that

the Mother's past conduct was reckless or indifferent to risk with respect to the mother's boyfriend, nor that her future conduct would endanger the children, such "that [the children] will suffer physical or emotional harm if custody [is] awarded to the [Mother]."[8]

(c) *Children's medication.* Regarding the children's medication, there was evidence that the son was high-functioning on the autism spectrum and had been prescribed medication. The Grandmother testified that after the Mother first took the children to Florida, the Mother returned the children back to the Father and Grandmother, and the son became distraught at the changeover in custody. The Grandmother testified that "[I] did my best to comfort him because he hadn't had his medication for a month." There is no other testimony explaining the level or length of his distress, what the medication was, for what purpose it was ordered, or whether

---

[8] (Punctuation and emphasis omitted.) *Floyd*, 337 Ga. App. at 478 (1), citing *Clark*, 273 Ga. at 599 (V). See also *Fyffe v. Cain*, 353 Ga. App. 130, 135 (2) (c) (836 SE2d 602) (2019) (physical precedent only) (finding insufficient harm to child because "although these past episodes of violence in the Mother's life are troubling, there is absolutely no evidence that the mother had allowed the men to be violent to H. C. or that the child had any knowledge" of the circumstances of violence that her Mother had been exposed to).

it would have affected the son's level of distress. As a practical matter, any changeover in long-term custody can be emotionally traumatic for any child, especially one with special needs, and the child had other episodes of distress despite his medication status. The Grandmother's account of this isolated episode at a custody handoff does not amount to "clear and convincing" evidence that the Mother "contrary to medical advice removed the minor children from doctor prescribed medication, which resulted in severe mental and physical health issues for [the son]."[9]

(d) *Failure to provide the necessities and going prolonged periods without communicating with the children.* The record shows that the Grandmother had been the primary caregiver for approximately one and a half years leading up to the final hearing in December 2022. Before that time, the Mother was the primary caregiver, and the Grandmother was heavily involved and babysitting when the Mother worked. For example, the Grandmother went with the Mother to various doctor visits and testified that the Mother had qualified the boy for Medicaid coverage. Thus, there was a clear partnership between the Mother and the Grandmother, who continued to work together cordially throughout the custody dispute.

---

[9] (Emphasis supplied.)

While the Grandmother had custody, the Mother's attempts at contacting the children or exercising visitation during this time were often thwarted by the Father, who actively interfered with the Mother's phone calls. The GAL described the Father's cooperation with communication or visitation as "minimal," disruptive, and "completely inappropriate" when the Mother was allowed to speak to the children by phone. Nevertheless, when the Mother was allowed visitation in June 2022 after not seeing the children for "quite some time," the visit went well and "[t]he kids were very comfortable with her." Further, the Mother's subsequent weekend visits went well, and the children did not appear to lose their bond to the Mother throughout this period. Based on this record, the Mother's conduct does not support a finding that she had, as a practical matter, abandoned her children, failed to provide them with necessities, or would fail to do so if awarded primary custody.

(e) *Returning the children to the Grandmother*. The Grandmother testified that after the Mother took the children to Florida in April 2021, she offered to transfer them back to the Grandmother after approximately a month. During a subsequent proceeding pursuant to the Father's request for a TPO, the Mother was awarded custody, but later that day, she came to an agreement with the Grandmother that the

Grandmother would take the son and the Mother would take the daughter for the time being. After the July 2021 legitimation order, the Grandmother kept the son throughout the rest of 2021 and 2022, and ultimately registered both children for school, which they attended near the Grandmother. Since the summer of 2021, the Mother did not have primary custody of the children and only saw them as sporadically allowed pursuant to her visitation rights.

As noted above, in the meantime, the Mother testified that she has married and established a stable home for the children. Leading up to the final hearing, when permitted by the Father, the Mother at least twice had successful and positive unsupervised weekend visitations with the children. She understands her son's needs, and the GAL testified that he believed the Mother would be the better custodial parent, stating that he had no concerns about the Mother's drug use, her bond with the children, and her living circumstances. He further noted that the Mother and Grandmother get along and were cooperative in their caregiving, and that the Grandmother should remain in the children's lives.[10]

---

[10] See *Stone v. Stone*, 297 Ga. 451, 454-455 (774 SE2d 681) (2015) (holding that Georgia statutory law only permits joint legal custody arrangements between parents).

In sum, viewing the circumstances as a whole, this record does not reflect an abandonment by the Mother, nor does it reflect her inability to care for the children.

> We are mindful that in the appellate review of a bench trial, a trial court's factual findings must not be set aside unless they are clearly erroneous. However, even accepting [the supported] factual findings as true, and although it is clear that the trial court intended to act in the best interest of the child, the trial court was not authorized to conclude that the [Grandmother] had demonstrated by clear and convincing evidence that an award of custody to the [M]other would cause either physical harm or significant, long-term emotional harm to [the children].[11]

The Grandmother's burden in this context is to demonstrate that the Mother lacks the "ability to provide for the children in a manner sufficient to preclude the need for an entity of the government to intervene and separate the children from the parent,"[12] and that the children will suffer long-term harmed caused by the Mother's custody. The record fails to do so. The Grandmother's fitness is demonstrated by the record, and her involvement has clearly benefitted the children (and the parents). But this alone does not overcome the statutory burden required to supercede a parent's

---

[11] (Citations and punctuation omitted.) *Jewell*, 346 Ga. App. at 737 (1).

[12] (Punctuation omitted.) Id. at 736 (1).

custodial rights to her children. "[A] court is not permitted to terminate a parent's natural right to custody merely because it believes that the children might have better financial, educational, or moral advantages elsewhere."[13] Accordingly, we reverse the trial court's judgment awarding custody to the Grandmother and remand the cases for further proceedings consistent with this opinion.[14]

2. Based on our holding above, any remaining enumerations are moot.

*Judgments reversed and cases remanded. Hodges and Watkins, JJ., concur.*

---

[13] (Punctuation omitted.) Id. at 736 (1).

[14] See *Richello v. Wilkinson*, 361 Ga. App. 703, 716 (6) (865 SE2d 571) (2021); *Jewell* , 346 Ga. App. at 737 (1).